UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY CO.,

                              Plaintiffs,

                    v.

INNOVATION ANESTHESIA & PAIN
SERVICES, P.C., DONGHUI CHEN, M.D., JPM
PHYSICAL THERAPY, P.C., SABINIANO
MANGGURAY, P.T., LIBERTY PARK
CHIROPRACTIC, P.C., JOSEPH CICCONE, D.C.,
HAO ACUPUNCTURE, P.C., and HONG ZHU
WU, L.Ac.,

                            Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
24-CV-2220 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO" or "Plaintiffs")

commenced the above-captioned action on March 26, 2024, against Defendants Innovation

Anesthesia & Pain Services, P.C. ("Innovation Anesthesia"); Donghui Chen, M.D. ("Chen");

JPM Physical Therapy, P.C. ("JPM PT"); Sabiniano Mangguray, P.T. ("Mangguray"); Liberty

Park Chiropractic, P.C. ("Liberty Park Chiro"); Joseph Ciccone, D.C. ("Ciccone"); Hao

Acupuncture, P.C. ("Hao Acupuncture"); and Hong Zhu Wu, L.Ac ("Wu").  (Compl., Docket

Entry No. 1.)  Plaintiffs allege, *inter alia*, that Defendants wrongfully obtained no-fault insurance

reimbursements for medically unnecessary healthcare services in violation of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)–(d) ("RICO") and are liable for

common law fraud, aiding and abetting fraud, and unjust enrichment, (*id.* ¶¶ 1, 265–401), and seek damages against all defendants, and a declaratory judgment against Innovation Anesthesia, Liberty Park Chiro, Hao Acupuncture, and JPM PT, (*id.* ¶¶ 261–401).

On September 24, 2024, Plaintiffs moved to (1) stay, until resolution of litigation, all pending no-fault insurance collection arbitrations and state court collections litigation commenced against GEICO by or on behalf of Innovation Anesthesia, Chen, Liberty Park Chiro, Mangguray, Ciccone, and JPM PT; and (2) enjoin all Defendants, until resolution of litigation, from commencing any new no-fault insurance collection arbitrations or new no-fault collections litigation against GEICO.[1]  Defendants opposed the motion.[2]  For the reasons set forth below, the Court grants Plaintiffs' motion to stay (1) all pending arbitrations, (2) all future arbitrations, (3) all pending state court proceedings, and (4) all future state court proceedings.

## I.    Background

### a.    New York and New Jersey's no-fault insurance scheme

Under New York's no-fault law, automobile insurers provide mandatory coverage for certain no-fault benefits, including necessary expenses for medical treatment up to $50,000.[3] N.Y. Ins. Law §§ 5102(a)(1), 5102(b), 5103; *see also State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 71 (2d Cir. 2024) ("The No-Fault Act provides compensation for 'basic economic loss,' which covers, as relevant here, 'necessary' health

---

[1]  (Pls.' Mot. to Stay ("Pls.' Mot."), Docket Entry No. 28-1; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 28-2; Pls.' Reply in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 28-19.)

[2]  (Defs.' Response to Pls.' Mot. ("Defs.' Opp'n"), Docket Entry No. 28-4.)

[3]  Because it is helpful to understand the facts of the case, the Court provides a brief overview of New York's no-fault insurance scheme before discussing the relevant facts.  *See generally Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 281–83 (E.D.N.Y. 2013) (providing a detailed overview of New York's no-fault scheme).

expenses up to $50,000 per person."  (quoting N.Y. Ins. Law § 5102(a))).  "The Act's implementing regulations allow covered individuals to assign their statutory benefits to licensed health care providers in exchange for services, and the providers in turn can submit claims directly to the insurance company for medically necessary expenses."  *See id.* (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11(a)); *United States v. Zemlyansky*, 908 F.3d 1, 7 (2d Cir. 2018) ("[I]ndividuals injured in car accidents assign their statutory benefits to licensed medical professionals, who submit claims for medically 'necessary' treatments directly to the injured party's insurance carriers." (first quoting N.Y. Ins. Law § 5102; and then citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11)).  The regulation also states that "[i]n the event any person making a claim for first-party benefits and the [insurance] [c]ompany do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration."  N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1(d); *see State Farm*, 120 F.4th at 87; *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 87 (2d Cir. 2014) (quoting N.Y. Comp. Codes R. & Regs. tit. 11, § 65-1.1).

"New Jersey also has a comprehensive no-fault regime."  *Gov't Emps. Ins. Co. v. Mahmood*, No. 23-CV-4388, 2024 WL 113958, at *2 (E.D.N.Y. Jan. 10, 2024); *see, e.g.*, the Compulsory Insurance Law (N.J. Stat. Ann. §§ 39:6B-1–39:6B-3; *Citizens United Reciprocal Exch. v. Perez*, 121 A.3d 374, 379 (N.J. 2015)) and the New Jersey Automobile Reparation Reform Act (N.J. Stat. Ann. §§ 36A-1–36A-35).  Claimants may "assign[]" their no-fault claims "to healthcare service providers."  *Gov't Emps. Ins. Co. v. Beynin*, No. 19-CV-6118, 2021 WL 1146051, at *2 n.1 (E.D.N.Y. Mar. 25, 2021).  New Jersey's no-fault regime includes an arbitration statute which allows for arbitration of disputes concerning "medical expense benefits" including "whether the disputed medical treatment was actually performed," the "necessity . . . of

3

consultations by other healthcare providers," and "whether the treatment performed is reasonable, necessary, and compatible with the protocols provided." N.J. Stat. Ann. § 39:6A-5.1. New Jersey's no-fault laws also include the New Jersey Insurance Fraud Prevention Act ("IFPA") under which plaintiffs may instead bring an action relating to fraudulent insurance claims in state or federal court. *See* N.J. Stat Ann. §§ 17:33A-1–17:33A-34. A person violates the IFPA if he or she "[p]resents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." *Id.* § 17:33A-4(a)(1). "Although New Jersey generally requires arbitration for no-fault insurance claims, New Jersey courts have repeatedly found that claims under the IFPA may be heard in state or federal courts." *Gov't Emps. Ins. Co. v. Gerling*, 718 F. Supp. 3d 268, 271 (E.D.N.Y. 2024); *see Gov't Emps. Ins. Co. v. Elkholy,* No. 21-16255, 2022 WL 2373917, at *9–10 (D.N.J. June 30, 2022) ("[C]ourts routinely uphold the IFPA's absolute mandate for judicial resolution notwithstanding contractual clauses that would otherwise require arbitration of IFPA claims." (first citing *Nationwide Mut. Fire Ins. Co. v. Fiouris*, 928 A.2d 154, 157 (N.J. Super. Ct. App. Div. 2007); and then citing *Fed. Ins. Co. v. von Windherburg-Cordeiro*, No. 12-CV-2491, 2012 WL 6761877, at *4 (D.N.J. Dec. 31, 2012))); *Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 492 (D.N.J. 2018) ("The [IFPA] is not preempted by [no-fault] arbitration rules.").

### b.  The parties

Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company "are Nebraska corporations with their principal places of business in Chevy Case, Maryland." (Compl. ¶ 7.) "GEICO is authorized to conduct business and to issue automobile insurance policies in New York and New

Jersey." (*Id.*) "GEICO underwrites automobile insurance in New York and New Jersey." (*Id.* ¶ 22.)

Chen is a citizen of New York, and was licensed to practice medicine in New York on or about May 6, 2004, and in New Jersey on or about June 7, 2004. (*Id.* ¶ 9.) Plaintiffs contend that Chen "owned and controlled Innovation Anesthesia, purported to perform virtually all of the [f]raudulent [s]ervices," and "used Innovation Anesthesia as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO. . . ." (*Id.*) "Innovation Anesthesia is a New York medical professional corporation with its principal place of business in New York." (*Id.* ¶ 8.)

Mangguray is a citizen of New York, and "was licensed to practice physical therapy in New York on or about May 27, 2009." (*Id.* ¶ 11.) Plaintiffs contend that Mangguray "owned and controlled JPM PT, purported to perform many of the [f]raudulent [s]ervices," and "used JPM PT as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO. . . ." (*Id.*) "JPM PT is a New York physical therapy professional corporation with its principal place of business in New York." (*Id.* ¶ 10.)

Ciccone is a citizen of New York, and "was licensed to practice chiropractic in New York on or about August 6, 1999." (*Id.* ¶ 13.) Plaintiffs contend that Ciccone "owned and controlled Liberty Park Chiro, purported to perform many of the [f]raudulent [s]ervices," and "used Liberty Park Chiro as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO. . . ." (*Id.*) "Liberty Park Chiro is a New York chiropractic professional corporation with its principal place of business in New York." (*Id.* ¶ 12.)

Wu is a citizen of New York, and "was licensed to practice acupuncture in New York on or about February 14, 2001." (*Id.* ¶ 15.) Plaintiffs contend that Wu "owned and controlled Hao Acupuncture, purported to perform many of the [f]raudulent [s]ervices," and "used Hao

Acupuncture as a vehicle to submit fraudulent and unlawful no-fault insurance billing to GEICO. . . ." (*Id.*) "Hao Acupuncture is a New York acupuncture professional corporation with its principal place of business in New York." (*Id.* ¶ 14.)

### c. The alleged fraudulent scheme

Plaintiffs contend that "Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent and unlawful no-fault insurance charges" through Innovation Anesthesia, JPM PT, Liberty Park Chiro, and Hao Acupuncture "for purported examinations, pain management injections, radiofrequency nerve ablations, epidurography, fluoroscopic guidance, acupuncture, chiropractic, physical therapy, and related services." (*Id.* ¶ 1.) In particular, Plaintiffs allege that "Defendants engaged in an unlawful patient brokering scheme whereby they paid and received unlawful compensation in exchange for patient referrals" in addition to "misrepresent[ing] the nature, extent, results, and medical necessity of the healthcare services they purported to provide, and falsely represent[ing] that they were in compliance with relevant law and eligible to receive no-fault insurance reimbursement in the first place, when in fact they were not." (*Id.* ¶ 2.)

"Beginning no later than 2018," Defendants enacted an "unlawful scheme" in which they caused "fraudulent . . . [statutory no-fault] billing to be submitted to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services in New York and New Jersey." (*Id.* ¶ 46.) Plaintiffs contend that Defendants' unlawful scheme comprised four main components: (1) Innovation Anesthesia's unlawful provision of professional services in New Jersey, (*id.* ¶¶ 47–53); (2) Defendants' agreements among themselves to refer patients for unnecessary medical services in exchange for unlawful compensation, (*id.* ¶¶ 54–78); (3) Defendants' provision of medically unnecessary treatments and submission of fraudulent charges

for those services, (*id.* ¶¶ 79–252); and (4) Defendants' fraudulent concealment of their billing practices, (*id.* ¶¶ 253–60).

### i.    Innovation Anesthesia's New Jersey operations

Plaintiffs allege that because Innovation Anesthesia was only a New York corporation, they "could not lawfully provide medical or other professional services in the state of New Jersey." (*Id.* ¶¶ 48–49.)  However, Plaintiffs contend that Chen "routinely caused Innovation Anesthesia to unlawfully provide purported medical services in New Jersey, which then were billed to GEICO." (*Id.* ¶ 50.)  Plaintiffs allege that Innovation Anesthesia and Chen submitted more than $100,000 in billing to GEICO "for services unlawfully provided — to the extent they were provided at all — through Innovation Anesthesia in New Jersey." (*Id.* ¶ 52.)

### ii.    Defendants' referral and payment scheme

Plaintiffs allege that Defendants had "secret agreements" to refer insureds to Innovation Anesthesia "for expensive and medically unnecessary interventional pain management services, despite the [i]nsured's lack of any genuine presenting problems that would warrant the examinations and injections." (*Id.* ¶ 59.)  JPM PT, Mangguray, Liberty Park Chiro, Ciccone, Hao Acupuncture, and Wu referred patients to Innovation Anesthesia and Chen "for expensive and medically unnecessary/excessive examinations and interventional pain management services, despite the [i]nsureds' lack of any genuine presenting problems that would warrant those services." (collectively, the "Referring Defendants").  (*Id.* ¶¶ 55–58, 239.) Plaintiffs contend that these initial referrals were not medically necessary.  First, they argue that Referring Defendants often referred patients who "had yet to fail a legitimate course of conservative treatment." (*Id.* ¶¶ 68–72.)  Plaintiffs note that "[i]n a legitimate clinical setting, referrals for pain management services generally will be improper unless the patient has failed" a more conservative treatment.  (*Id.* ¶ 69.)  However, Innovation Anesthesia and Chen "pursuant to

their unlawful referral scheme, often received medically unnecessary pain management referrals from the Referring Defendnats long before the patients failed a legitimate course of conservative treatment." (*Id.* ¶ 70.) Second, Plaintiffs contend that Defendants provided "differently situated" patients, *i.e.*, patients who "were different ages, in different physical conditions," who "suffered from different injuries, to the extent they suffered any injuries at all," who "did not require . . . referrals in the first instance," with the same course of "[f]raudulent" treatment. (*Id.* ¶¶ 77–78.) For example, the Referring Defendants referred multiple insureds who had been involved in the same underlying minor accident to Innovation Anesthesia and Chen for services "on or about the same date, despite the fact that the [i]nsureds were differently situated." (*Id.* ¶ 73.) Plaintiffs allege that it is "highly improbable" that "any two or more [i]nsureds" involved in minor accidents would "suffer substantially similar injuries" or "require a substantially similar course of treatment," and that it is nearly impossible that this pattern would occur "on many occasions." (*Id.* ¶¶ 74–76; *see also* ¶¶ 150–52.)

Innovation Anesthesia and Chen, in turn, unlawfully compensated the Referring Defendants through (1) payments for initial referrals disguised as rent payments for Innovation Anesthesia and Chen's use of the Referring Defendants' offices,[4] and (2) "return referrals" to the Referring Defendants from Innovation Anesthesia and Chen for additional medically unnecessary services. (*Id.* ¶ 61.) Plaintiffs contend that the purported rent payments Innovation Anesthesia and Chen made to the Referring Defendants "were not for fixed fees set in advance, and did not cover any regular lease terms," (*id.* ¶ 65.) Plaintiffs contend that the Referring Defendants' offices "did not contain any external signage or other indicia of Innovation

---

[4] The offices are located at 93-16 Liberty Avenue, Ozone Park, New York. (Compl. ¶ 61.)

Anesthesia and Chen" operating from the offices, and further contend that Innovation Anesthesia and Chen "did not maintain regular office hours" and instead appeared "sporadically" only to treat "patients who were referred to them by the Referring Defendants" pursuant to the scheme. (*Id.* ¶¶ 64–66.)

In addition, Plaintiffs allege that the Referring Defendants engaged in a return referral scheme, where Innovation Anesthesia and Chen would refer the insureds back to the Referring Defendants for additional treatment as "unlawful compensation to the Referring Defendants for their initial referrals of [i]nsureds to Innovation Anesthesia and Chen. (*Id.* ¶ 67.) They allege Innovation Anesthesia and Chen made "false contentions" through the return referrals "that [i]nsureds continued to suffer from significant levels of pain, functional deficits, and radiculopathies" to provide both a "false justification for the medically unnecessary [services] that [Referring Defendants] already had provided" as well as a "false justification for the Referring Defendants to continue to provide medically unnecessary chiropractic, physical therapy, and acupuncture services." (*Id.* ¶¶ 67, 239.)

### iii. Defendants' submission of fraudulent charges and provision of medically unnecessary treatments

Plaintiffs allege that Defendants submitted fraudulent charges for a wide variety of treatments. Plaintiffs allege that Innovation Anesthesia, Chen, Liberty Park Chiro, Ciccone, Hao Acupuncture, and Wu submitted fraudulent charges for conducting "initial examinations" and "follow-up examinations." (*Id.* ¶¶ 79–86; 169–74.) Plaintiffs contend that "as a result of the fraudulent and unlawful scheme," Innovation Anesthesia, Chen, Liberty Park Chiro, Ciccone, Hao Acupuncture, and Wu were not "in compliance with all significant laws and regulations or licensing laws governing healthcare practice" and thus ineligible to submit claims for the initial or follow-up examinations. (*Id.* ¶ 85.) In addition, Defendants also "misrepresented the extent,

nature, and results" of the examinations, (*id.* ¶¶ 86, 174), and, in extreme cases, whether "the putative initial examinations were conducted in the first instance," (*id.* ¶¶ 157–68).  Plaintiffs also allege Innovation Anesthesia and Chen falsely represented that they conducted "consultations" rather than "examinations," because "such consultations were reimbursable at a higher rate than commensurate, ordinary patient examinations."  (*Id.* ¶ 91.)  In addition, Plaintiffs allege Defendants artificially inflated their claims for reimbursement by misrepresenting: (1) the severity of insureds' "presenting problems" at initial and follow-up examinations "in order to create a false basis for the laundry list of other [f]raudulent [s]ervices that the Defendants purported to provide to the [i]nsureds," (*id.* ¶¶ 92–102, 175–86); (2) the time Defendants spent with patients during examinations because examinations that require more time "are reimbursable at a higher rate than examinations that require less time to perform," (*id.* ¶¶ 103–15); (3) the extent of physical examinations because more detailed physical examinations are reimbursable at higher rates, (*id.* ¶¶ 116–28); (4) the complexity of the case or extent of medical decision-making involved because examinations requiring "complex medical decision-making" are reimbursable at higher rates, (*id.* ¶¶ 129–56); and (5) the results of follow-up examinations where Defendants claimed "[i]nsureds continued to suffer pain and other symptoms" so that Defendants could provide "a false basis for the laundry list of other [f]raudulent [s]ervices," (*id.* ¶¶ 187–93).

Plaintiffs further allege that Defendants provided inappropriate and medically unnecessary treatments to insureds.  First, Plaintiffs argue Innovation Anesthesia and Chen subjected "many [i]nsureds to a series of medically unnecessary pain management injections" as part of the "false, boilerplate 'diagnoses'" they provided during their "fraudulent examinations." (*Id.* ¶¶ 194–211.)  For example, Plaintiffs describe that "in order to maximize the fraudulent

billing," Innovation Anesthesia and Chen provided "multiple pain management injections — and multiple varieties of pain management injections — to [i]nsureds within a span of weeks," placing insureds "at considerable risk." (*Id.* ¶ 208.)  Second, Plaintiffs contend that Defendants "routinely and fraudulently unbundled separate charges for fluorosciopic guidance from the underlying injection charges, in a calculated effort to increase their billing for the medically unnecessary injections." (*Id.* ¶¶ 212–26.)  Plaintiffs note that "fluoroscopic guidance is a component part of, and included in, charges for pain management injections," and healthcare services providers are thus "not entitled to be reimbursed separately for fluoroscopic guidance . . . when billing for pain management injections." (*Id.* ¶¶ 214–15.)  In addition, Plaintiffs contend that Innovation Anesthesia and Chen "frequently submitted separate charges for epiduorgraphy that supposedly was necessary to perform the injections," even though fluoroscopic guidance is included in the epidurography charges, and healthcare services providers are not entitled to bill separately for fluoroscopic guidance and epidurography. (*Id.* ¶¶ 219–24.)  Third, Plaintiffs allege that Innovation Anesthesia and Chen provided medically unnecessary radiofrequency nerve ablation ("RFA"). (*Id.* ¶¶ 227–35.)  Plaintiffs contend that Defendants' treatment of insureds' injuries with RFA services, "months after the underlying accidents, [and therefore] long after the [i]nsureds' minor soft tissue injuries resolved," served to "damage or destroy . . . nerve endings" in the spines of insureds that are "responsible for transmitting pain signals to the patient." (*Id.* ¶¶ 233–35.)  Fourth, Plaintiffs contend Defendants submitted claims for chiropractic, physical therapy, and acupuncture services that were "medically unnecessary" and performed, if at all, "pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to [Plaintiffs]." (*Id.* ¶ 243.)

Plaintiffs allege that Defendants' submission of bills and treatments reports thus

contained "thousands of fraudulent charges, seeking payment for the [f]raudulent [s]ervices for which they were not entitled to receive payment." (*Id.* ¶ 251.) They contend that the "bills and treatment reports were false and misleading" because they (1) "uniformly misrepresented to GEICO that the Defendants were in compliance with all significant statutory and regulatory requirements governing healthcare practice and/or licensing laws"; (2) "uniformly misrepresented to GEICO that the [f]raudulent [s]ervices were provided in compliance with all significant statutory and regulatory requirements"; (3) "uniformly misrepresented to GEICO that the [f]raudulent [s]ervices were medically necessary, and, in many cases, misrepresented to GEICO that the [f]raudulent [s]ervices actually were performed in the first instance"; and (4) "misrepresented and exaggerated the level of the [f]raudulent [s]ervices, the nature of the [f]raudulent [s]ervices that purportedly were provided, and the reimbursable amounts for the [f]raudulent [s]ervices." (*Id.* ¶ 252.)

### iv.  Defendants' fraudulent concealment of their billing practices

Plaintiffs allege that Defendants "systemically concealed their fraud" to induce GEICO "to promptly pay the fraudulent charges for the [f]raudulent [s]ervices." (*Id.* ¶ 254.) They contend that Defendants "knowingly misrepresented and concealed facts" to prevent GEICO from discovering that Defendants either never performed services for which they sought reimbursement or that services they did perform were conducted "pursuant to an illegal referral scheme." (*Id.* ¶¶ 256–57.) Plaintiffs allege that as a part of Defendants' scheme, they "hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers." (*Id.* ¶ 258.) The law firms routinely filed "expensive and time-consuming arbitrations" against GEICO if the charges were not paid in full. (*Id.*) Defendants currently have 760 arbitrations and more than 200 individual lawsuits in New York state court pending against Plaintiffs. (Pls.' Mem. 7.) In the month following the filing of the Complaint in this case, Innovation Anesthesia, JPM PT,

and Liberty Park Chiro initiated over 500 suits and arbitrations against GEICO, and Defendants are "actively pursuing collection" on fraudulent charges.  (*Id.* at 4–5.)  Plaintiffs note that Defendants' "facially-valid documents submitted to GEICO in support of the fraudulent charges" were "designed to and did cause GEICO to rely upon them" in complying with their "statutory and contractual obligations to promptly and fairly process claims."  (Compl. ¶¶ 253, 259.)  They allege that, as a result of Defendants' "material misrepresentations, omissions, and other affirmative acts to conceal their fraud," GEICO has incurred damages of more than $6,300,000 and that they "could not reasonably have discovered that its damages were attributable to fraud until shortly before" filing this case.  (*Id.* ¶¶ 259–60.)

## II.  Discussion

### a.  Standard of review

"The preliminary injunction standard applies where . . . a party seeks to stay pending no-fault insurance claims and to enjoin the filing of further claims during the pendency of a lawsuit seeking to invalidate those claims."  *Beynin*, 2021 WL 1146051, at *4 (collecting cases); *see also Gov't Emps. Ins. Co. v. Wellmart, Inc.*, 435 F. Supp. 3d 443, 449 (E.D.N.Y. 2020) (analyzing a motion to stay and enjoin no-fault collection proceedings under the preliminary injunction standard), *appeal dismissed*, No. 20-225 (2d Cir. May 11, 2020).  "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'"  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)); *see also State Farm*, 120 F.4th at 79 ("A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005))); *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (same).  The purpose of a preliminary injunction is to "preserve the relative positions of

the parties until a trial on the merits can be held." *Benisek*, 585 U.S. at 161 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021); *see also State Farm*, 120 F.4th at 79 (noting that "to obtain a preliminary injunction," the movant "must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018))).

### b. The Anti-Injunction Act

As an initial matter the Court first determines whether the Anti-Injunction Act ("AIA") limits the Court's authority to stay Defendants' pending proceedings in state court.[5] The parties dispute whether any exceptions to the AIA apply to Plaintiffs' request that the Court stay these pending state court collections actions. Plaintiffs argue that the AIA "expressly allows a federal court to stay such pending proceedings 'where necessary in aid of its jurisdiction, or to protect or effectuate its judgment.'"[6] (Pls.' Mem. 20 (quoting 28 U.S.C. § 2283).) Defendants argue that

---

[5] Defendants do not argue that the Federal Arbitration Act applies to limit the Court's authority to enjoin pending or future arbitrations. (*See generally* Defs.' Opp'n.) Therefore, the Court's analysis is limited to whether the Anti-Injunction Act bars the Court from enjoining Defendants' pending state-court actions.

[6] Plaintiffs argue that several courts in the Eastern District "have routinely stayed . . . all state court collections lawsuits pending against an insurer in virtually identical circumstances — each citing to the 'in aid of its jurisdiction' exception of the AIA.'" (Pls.' Mem. 20 (citing *Gov't Emps. Ins. Co. v. Wallegood, Inc.*, No. 21-CV-1986 (E.D.N.Y. July 16, 2021) (order granting preliminary injunction)); Pls.' Reply 9 (citing *Gov't Emps. Ins. Co. v. Gerling*, 718 F. Supp. 3d 268 (E.D.N.Y. 2024); *Gov't Emps. Ins. Co. v. Patel*, No. 23-CV-2835, 2024 WL 84139

the "expressly-authorized exception" to the AIA "does not apply to Plaintiffs' request for a preliminary injunction," (Defs.' Mem. 14 (citation omitted)), and, even if the AIA did apply to Plaintiffs' request, Plaintiffs "cannot satisfy the 'necessary in aid' of the court's jurisdiction exception to the Act." (Defs.' Mem. 14 (citing *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 17-CV-2802, 2018 WL 6031156, at *9 (E.D.N.Y. Nov. 16, 2018)).)

"Almost as old as the Constitution, the AIA today provides that '[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'" *State Farm*, 120 F.4th at 92 (alteration in original) (quoting 28 U.S.C. § 2283); *see also Pathways, Inc. v. Dunne*, 329 F.3d 108, 113 (2d Cir. 2003) ("The Anti-Injunction Act, subject to some exceptions, prohibits injunctive relief that would interfere, directly or indirectly, with pending state proceedings." (citing *County of Imperial v. Munoz*, 449 U.S. 54, 58–59 (1980))). "Application of the AIA is limited only by the 'three specifically defined exceptions' in the statute that are 'narrow,' so '[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed.'" *State Farm*, 120 F.4th at 92 (alteration in original) (quoting *Smith v.*

---

(E.D.N.Y. Jan. 8, 2024); *State Farm Mut. Auto. Ins. Co. v. Herschel Kotkes*, No. 22-CV-3611, 2023 WL 4532460 (E.D.N.Y. July 13, 2023); *Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440, 2022 WL 939717 (E.D.N.Y. Mar. 29, 2022); *Gov't Emps. Ins. Co. v. Big Apple Med.*, No. 20-CV-5786 (E.D.N.Y. Mar. 25, 2021) (order granting motion to stay and enjoin); *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 229 (E.D.N.Y. 2018); *State Farm Mut. Auto. Ins. Co. v. Jamaica Wellness Med., P.C.*, No. 16-CV-4948 (E.D.N.Y. May 18, 2017) (Min. Entry dated May 18, 2017).) Plaintiffs also argue that "an injunction staying [pending collections] lawsuits until this action is resolved is absolutely necessary to aid the jurisdiction of this Court, prevent fragmented results, and avoid a drain of resources for all parties involved." (Pls.' Reply 9.) In addition, Plaintiffs argue that "an injunction 'enjoining the state actions in this case is consistent with the purpose of the AIA, which is rooted in respect for the sovereignty of state governments over matters within their jurisdiction.'" (Pls.' Mem. 22 (quoting *Parisien*, 352 F. Supp 3d at 231).)

15

*Bayer Corp.*, 564 U.S. 299, 306 (2011)); *see also Dr.'s Assocs., LLC v. Tripathi*, 794 F. App'x 91, 93 (2d Cir. 2019) (explaining that the Anti-Injunction Act contains three exceptions: it "bars a federal court from enjoining a proceeding in state court unless that action is 'expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments'").[7]  "The AIA reflects our 'dual system of federal and state courts,' and its 'core message is one of respect for state courts.'"  *State Farm*, 120 F.4th at 92 (quoting *Smith*, 564 U.S. at 306).

Because the statutory prohibition against such injunctions in part "rests on the fundamental constitutional independence of the [s]tates and their courts, the exceptions should not be enlarged by loose statutory construction."  *United States v. Schurkman*, 728 F.3d 129, 135 (2d Cir. 2013) (quoting *Atl. Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970)); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 348 F.R.D. 151, 169 (E.D.N.Y. 2024) (same).

"[T]he first exception to the AIA allows federal courts to enjoin state-court proceedings when 'expressly authorized by Act of Congress.'"  *State Farm*, 120 F.4th at 92 (quoting 28 U.S.C. § 2283).  In order "for the exception to apply, 'Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding.'"  *Id.* at 93 (quoting *Mitchum v. Foster*, 407 U.S. 225, 237 (1972)).  As the Second Circuit recently reiterated, "the Supreme Court held in the seminal case of *Mitchum v. Foster* that 'no prescribed formula is

---

[7]  28 U.S.C. § 2283 provides, in full, that "[a] court of the United States may not grant an injunction to stay proceedings in a [s]tate court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

required' for the exception to apply, and that the federal statute 'need not expressly refer to § 2283' nor 'expressly authorize an injunction of a state court proceeding in order to qualify as an exception.'" *Id.* (internal quotation marks omitted) (quoting *Mitchum*, 407 U.S. at 237). "*Mitchum* accordingly created a two-part test providing that the 'expressly-authorized' exception to the AIA applies if Congress [1] clearly creat[ed] a federal right or remedy enforceable in a federal court of equity, [2] [that] could be given its intended scope only by the stay of a state court proceeding." *Id.* (internal quotation marks omitted and alterations in original) (quoting *Mitchum*, 407 U.S. at 238). In *Mitchum*, the Supreme Court found that "a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception," but "an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." 407 U.S. at 237; *see Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 632 (1977) (explaining that for the "expressly authorized" exception to apply, the statute (1) "must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity" and (2) it must be an "Act of Congress" which "could be given its intended scope only by the stay of a state court proceeding" (quoting *Mitchum*, 407 U.S. at 237–38)); *Texaco, Inc. v. Pennzoil Co.*, 626 F. Supp. 250, 259 (S.D.N.Y. 1986) (same), *aff'd as modified and remanded*, 784 F.2d 1133 (2d Cir. 1986), *rev'd on other grounds*, 481 U.S. 1 (1987). An Act of Congress is not required to be "totally incompatible with the prohibition of the anti-injunction statute" to qualify under the exception. *Mitchum*, 407 U.S. at 237–38. "The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Id.* at 238; *see Sierra v. City of New York*, 528 F. Supp. 2d 465, 468 (S.D.N.Y.

2008) (same).  In *State Farm*, the Second Circuit concluded that RICO satisfies the two-part test

the Supreme Court articulated in *Mitchum* and *Vendo*.  120 F.4th at 95.  First, RICO is "a

specific and uniquely federal right or remedy, enforceable in a federal court of equity."  *Id.*

(quoting *Mitchum*, 407 U.S. at 237).  The Second Circuit explained that "RICO was specifically

'designed to remedy injury caused by a pattern of racketeering, and concepts such as RICO

"enterprise" and "pattern of racketeering activity" were simply unknown to common law.'"  *Id.*

(quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 149–50 (1987)).

Thus, "RICO creates a uniquely innovative federal remedy that did not exist at common law."

*Id.* at 96.  In addition, the Second Circuit found that RICO is similar to statutes the Supreme

Court evaluated in *Mitchum* and *Vendo* and concluded were "specific and uniquely federal

right[s] or remed[ies]."  *Id.* at 97 ("Importantly, RICO's legislative history demonstrates that

Congress modeled civil RICO on the Clayton Act, which all the Justices in *Vendo* agreed was a

specific and uniquely federal right or remedy.  (citation omitted)); *id.* ("RICO's legislative

history reveals that in adopting the RICO statute, Congress was animated by concerns similar to

those underlying 42 U.S.C. § 1983 that *Mitchum* found persuasive.").  Second, "RICO could be

given its intended scope only by a stay of the hundreds of pending state-court proceedings."  *Id.*

As the Supreme Court concluded in *Vendo*, "where multiple meritless proceedings are a part of a

scheme to violate the relevant federal law in order to give that law its intended scope, an

injunction of state-court proceedings could fall within the 'expressly-authorized' exception."  *Id*.

The Second Circuit explained that because the plaintiffs "allege[] that the hundreds of frivolous

state-court proceedings *themselves* help to further the RICO violation," the "unusual

circumstances here fall squarely within *Vendo*."  *Id.* at 98.  The Second Circuit further explained

that the state-court proceedings in *State Farm* "furthered the alleg[ed] RICO violation in two key

ways": (1) "the proceedings help[ed to] finance the purported scheme," and (2) the "piecemeal nature" of the state-court proceedings, which often concerned the claims of a single individual, obscured the defendants' "overall complex scheme." *Id.* The Second Circuit noted that "[i]f the pending state-court proceedings are allowed to continue, [the plaintiff] faces the irreparable harm of never having a forum to demonstrate the existence of Defendants' alleged RICO scheme." *Id.* Accordingly, "the only way to give RICO its intended scope in the specific circumstances here is by staying the pending state-court proceedings." *Id.* The Second Circuit emphasized that its decision was "narrow and limited to the unusual circumstances alleged [in *State Farm*], which involve a massive scheme including hundreds of purportedly meritless state-court proceedings that help further a RICO violation." *Id.* at 98–99.

Plaintiffs' claims implicate identical "unusual circumstance[s]" the Second Circuit identified in *State Farm*. *Id.* at 99. First, Plaintiffs in this case allege RICO violations, which is the exact statute the Second Circuit concluded was a "specific and uniquely federal right or remedy." *Id.* at 95 (quoting *Mitchum*, 407 U.S. at 237). Plaintiffs' claims thus implicate uniquely federal rights or remedies and therefore satisfy the first prong of the *Mitchum* test. *See id.* at 95–96 ("RICO's legislative history demonstrates that Congress modeled civil RICO on the Clayton Act, which all the Justices in *Vendo* agreed was a specific and uniquely federal right or remedy." (citation omitted)); *Vendo*, 433 U.S. at 632 ("The private action for damages conferred by the Clayton Act is a 'uniquely federal right or remedy,' in that actions based upon it may be brought only in the federal courts. It thus meets the first part of the test laid down in the language quoted from *Mitchum*." (citation omitted)); *Armstrong v. Real Est. Int'l, Ltd.*, No. 05-CV-5383, 2006 WL 354983, at *3 (E.D.N.Y. Feb. 14, 2006) ("To qualify for the first exception to the Anti-Injunction Act, the equitable remedy . . . must be a uniquely federal one that could

19

only be enforceable in federal court."). Second, as in *State Farm*, Plaintiffs allege Defendants "hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers," amounting to over 1,000 combined state-court lawsuits and arbitrations against Plaintiffs. (*Id.* ¶ 258; Pl.'s Mem. 4–7.) Defendants' expensive and time-consuming lawsuits "*themselves* help to further the RICO violation" because, as in *State Farm*, their lawsuits enable Defendants to use the benefits obtained from those lawsuits "to continue financing their scheme, thereby constituting a 'pattern of baseless, repetitive claims.'" *State Farm*, 120 F.4th at 98 (quoting *Vendo*, 433 U.S. at 644). Plaintiffs' claims therefore satisfy the second prong of *Mitchum* because the Defendants' "meritless proceedings are a part of a scheme to violate the relevant federal law." *State Farm*, 120 F.4th at 97 ("RICO could be given its intended scope only by a stay of the hundreds of pending state-court proceedings here" because "where multiple meritless proceedings are a part of a scheme to violate the relevant federal law in order to give that law its intended scope, an injunction of state court proceedings could fall within the 'expressly-authorized exception.'")

Accordingly, the Court finds that the expressly-authorized exception to the AIA applies to Plaintiffs' request for a preliminary injunction of pending no-fault insurance state court proceedings.

### c.   Preliminary injunction

Plaintiffs argue that the Court should enjoin pending and future state court litigation and pending and future arbitrations, and argue in support that district courts within the Second Circuit have "consistently" granted "substantially similar motions to stay a defendant healthcare provider's no-fault collection proceeding[s] during the pendency of a plaintiff-insurer's fraud and declaratory judgment action." (Pls.' Mem. 6 (citations omitted).) Plaintiffs argue that GEICO satisfies the demands of the preliminary injunction standard. (*Id.* at 7–20.)

Defendants argue that Plaintiffs fail to establish the elements of a preliminary injunction. (Defs.' Opp'n 4–14.)

A party seeking a preliminary injunction "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *SAM Party*, 987 F.3d at 273–74; *see also Mendez v. Banks*, 65 F.4th 56, 63–64 (2d Cir. 2023), (explaining that the traditional preliminary injunction standard requires plaintiffs to show (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits . . . ," (2) "that [the plaintiffs] are likely to suffer irreparable injury in the absence of an injunction," (3) "that the balance of hardships tips in [the plaintiffs'] favor," and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction" (internal quotation marks and citations omitted) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010))); *cert. denied*, 144 S. Ct. 559 (2024); *Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (noting that "to obtain a preliminary injunction, the movant has to 'show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief'" (quoting *Citigroup Glob. Mkts., Inc. v. VCG Spec. Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010))).

### i.    Likelihood of success on the merits or sufficiently serious questions going to the merits

Plaintiffs argue that they have "[s]hown — at a [m]inimum — a [s]erious [q]uestion [g]oing to the [m]erits" of their claim, and have documented "considerable evidence that Defendants were not entitled to collect on the bills for the Fraudulent Service." (Pls.' Mem. 11.) In support, Plaintiffs argue that they have provided detailed allegations of Defendants' "scheme

of fraudulent activity," and argue three "serious questions" as to Defendants' behavior as part of this scheme, including (1) Innovation Anesthesia's unlawful operations in New Jersey, (*id.* at 14–15); (2) Defendants' unlawful compensation in exchange for patient referrals, (*id.* at 15–16); and (3) Defendants' fraudulent treatment and billing protocol, including "misrepresent[ations of] the nature, extent, and results of their putative examinations" that form "the fraudulent pattern," (*id.* 16–17).

Defendants argue that Plaintiffs fail to present "actual evidence" demonstrating a serious question or a likelihood of success on the merits.  (Defs.' Opp'n 9.)  In support, Defendants argue that, although "GEICO seeks a stay of all collection proceedings for three separate practices — Innovation Anesthesia . . . JPM [PT]. . . , and Liberty [Park Chiro]"  Plaintiffs "fail[ ] to clearly distinguish between these Defendants."  (*Id.*)  Defendants also argue that Plaintiffs fail to demonstrate that Chen could not provide medical services in New Jersey, (*id.* at 10), that "GEICO failed to substantiate the referral and kickback claims with any substantive support beyond allegations in the Complaint," (*id.*), and in particular "GEICO failed to provide an expert review as to the medical necessity issue in its moving papers," (*id.* at 11).

 "The 'serious questions' standard permits a district court to grant a preliminary injunction . . . where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."  *State Farm*, 120 F.4th at 82–83 (quoting *Citigroup*, 598 F.3d at 35); *Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (quoting same).  "The 'serious questions' standard allows courts to 'asses[] the merits of a claim at the preliminary injunction stage' by affording considerable 'flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex

litigation.'" *State Farm*, 120 F.4th 83 (quoting *Citigroup*, 598 F.3d at 35); *see also Beynin*, 2021 WL 1146051, at *6 ("The value of an approach encompassing the serious questions standard 'lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation.'").  "District courts in [this] Circuit have generally found that '[l]ikelihood of success is not the focus at the early stages of a case [involving an alleged scheme to defraud an insurer of assigned no-fault benefits] because any likelihood of success inquiry would be premature." *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 498 (E.D.N.Y. 2021) (second and third alterations in original) (quoting *Gov't Emps. Ins. Co. v. Zaitsev*, No. 20-CV-3495, 2021 WL 3173171, at *1 (E.D.N.Y. July 27, 2021)); *see Gov't Emps. Ins. Co. v. Landow*, No. 21-CV-1440, 2022 WL 939717, at *12 (E.D.N.Y. Mar. 29, 2022) (same); *Gov't Emps. Ins. Co. v. Advanced Comprehensive Lab'y, LLC*, No. 20-CV-2391, 2020 WL 7042648, at *5 (E.D.N.Y. Dec. 1, 2020) (same); *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 217 (E.D.N.Y. 2013) (same).  "Instead, [district courts] look to whether there is a serious question going to the merits to make them a fair ground for trial." *Relief Med.*, 554 F. Supp. 3d at 498 (alteration in original) (quoting *Zaitsev*, 2021 WL 3173171, at *1); *see Gov. Emps. Ins. Co. v. Demesmin*, No. 23-CV-6191, 2024 WL 4573698, at *2 (E.D.N.Y. Oct. 23, 2024) (quoting *Wellmart*, 435 F. Supp. 3d at 449) (same); *see also Gov. Emps. Ins. Co. v. Zilberman*, No. 20-CV-209, 2021 WL 1146086, at *1–2 (E.D.N.Y. Mar. 25, 2021) (applying the "serious question" standard in no-fault proceeding); *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *5–6 (same); *Wellmart*, 435 F. Supp. 3d at 453–55 (same); *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 220, 234 (E.D.N.Y. 2018) (same).

A medical professional corporation is prohibited from "directly or indirectly offering [or] giving . . . any fee or other consideration to or from a third party for the referral of a patient . . . in connection with the performance of professional services." N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3); *see also Gov't Emps. Ins. Co. v. Jacques*, No. 14-CV-5299, 2017 WL 9487191, at *2 (E.D.N.Y. Feb. 13, 2017) ("New York also prohibits paying kick-backs for patient referrals." (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(b)(3))), *report and recommendation adopted*, 2017 WL 1214460 (E.D.N.Y. Mar. 31, 2017); *Arthur Ave. Med. Servs., PC v. GEICO Ins. Co.*, 148 N.Y.S.3d 356, 361 (Civ. Ct. 2021) ("[A medical] corporation may not share professional service fees with third parties, such as referral fees." (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 29.1(B)(4))). "If a medical professional corporation engages in . . . unprofessional conduct, it is rendered ineligible for a requested no-fault reimbursement by virtue of [N.Y. Comp. Codes R. & Regs., tit. 11] § 65-3.16(a)(12)." *Mayzenberg*, 2018 WL 6031156, at *7 (quoting *Gov't Emps. Ins. Co. v. Badia*, No. 13-CV-1720, 2015 WL 1258218, at *9 (E.D.N.Y. Mar. 18, 2015)); *see also Jacques*, 2017 WL 9487191, at *2 ("To be eligible for reimbursement payments under the no-fault law, a provider of healthcare services must comply with applicable licensing requirements." (citing N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.16(a)(12))). "New York law [also] provides that defendants may be held liable for medically unnecessary services under New York's [no-fault] insurance laws." *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *7 (citing *Long Is. Radiology v. Allstate Ins. Co.*, 830 N.Y.S.2d 192, 194 (App. Div. 2007)). "[A] complaint alone can be sufficient to grant an injunction, [and] [t]his is particularly true where . . . the complaint comprehensively details regulatory violations, unnecessary medical services, and unlawful referrals." *Gov. Emps. Ins. Co. v. Moshe*, No. 20-CV-1098, 2020 WL 3503176, at *2 (E.D.N.Y. June 29, 2020) (collecting cases).

Plaintiffs allege that Defendants (1) used a predetermined treatment protocol, with Innovation Anesthesia and Chen acting as gatekeepers, and subjecting patients to "initial examinations" the results of which were "routinely falsified," (Pls.' Mem. 4, 17); (2) based on the findings of these examinations, Defendants diagnosed "substantially identical" deficiencies and injuries to patients, (*id.* at 17 (emphasis omitted)); (3) referred patients to providers who paid kickbacks for the referrals under the guise of "lease" agreements, and "return referrals back" to the Referring Defendants "for continued provision of medically unnecessary chiropractic, acupuncture, and physical therapy treatment," (*id.* at 15); and (4) submitted "thousands of bills" to Plaintiffs through Innovation Anesthesia, JPM PT, Liberty Park Chiro, and Hao Acupuncture for the services detailed above while concealing the existence of the "secret agreements" to refer patients for "expensive and medically unnecessary interventional pain management services" in exchange for return referrals and illegitimate payments disguised as legitimate "lease" payments, (*id.* at 15, 17).  These allegations sufficiently demonstrate a serious question going to the merits. *See Demesmin*, 2024 WL 4573698, at *4 (finding that the plaintiffs had "establish[ed] a serious question going to the merits" where the amended complaint detailed "a complex scheme of fraudulent billing and referrals among a network of chiropractic providers" and "numerous examples of charges billed without proper documentation or under suspicious circumstances"); *Zaitsev*, 2021 WL 3173171, at *2 (finding a serious question going to the merits where the complaint "detailed allegations of a complex scheme of fraudulent activity," including, *inter alia*, that the defendants "submitted charges . . . for healthcare services that were medically unnecessary," "provided the alleged fraudulent healthcare services pursuant to illegal kickback and self-referral arrangements," and "misrepresented that they were in compliance with all relevant laws and regulations"); *Beynin*, 2021 WL 1146051, at *6 (finding a serious question

going to the merits where the plaintiffs' complaint "detail[ed] a complicated scheme of alleged fraudulent activity" that "[gave] rise to an 'inference . . . that the treatments [we]re . . . not being provided on the basis of medical necessity'" (third and fourth alterations in original) (first quoting *Elzanaty*, 929 F. Supp. 2d at 222; and then quoting *Parisien*, 352 F. Supp. 3d at 229)); *Zilberman*, 2021 WL 1146086, at *2 (finding a serious question going to the merits where the "complaint provide[d] an extremely detailed overview of a complicated scheme" in which, *inter alia*, the defendants were alleged to have "provided fraudulent healthcare services that were not medically necessary" and "relied upon illegal kickback arrangements"); *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *6 (finding a serious question going to the merits where "the billed-for services were 'medically unnecessary and were provided — to the extent that they were provided at all — pursuant to pre-determined fraudulent protocols designed to financially enrich the [d]efendants'" (citation omitted)); *Moshe*, 2020 WL 3503176, at *2 (noting that a "plethora of precedent demonstrates courts routinely find a 'serious question going to the merits' under similar circumstances" (first citing *Gov't Emps. Ins. Co. v. Strut*, No. 19-CV-728, 2020 WL 1820500 (W.D.N.Y. Apr. 10, 2020); then citing *Parisien*, 352 F. Supp. 3d at 234; and then citing *Elzanaty*, 929 F. Supp. 2d at 222)); *Gov't Emps. Ins. Co. v. Cean*, No. 19-CV-2363, 2019 WL 6253804, at *5 (E.D.N.Y. Nov. 22, 2019) (finding a serious question as to the merits where the plaintiffs alleged "facts relating to [the defendants'] fraudulent activity in [their] [c]omplaint, describing fraudulent medical treatment, deceitful billing protocols, and an illegal kickback and referral scheme").

Contrary to Defendants' claims that Plaintiffs fail to allege sufficiently specific instances of treatments and payments to meet their evidentiary burden, (Defs.' Opp'n 2, 9), Plaintiffs allege in the 121-page Complaint detailed allegations of Defendants' fraudulent treatment and

26

kickback scheme, including specific details related to: (1) the operational history of 93-16 Liberty Avenue, in addition to the shifting nature of the "lease" kickback fees paid for patient referrals that "were not for fixed fees set in advance, and did not cover any regular lease terms," (Compl. ¶¶ 61–66); (2) the relationship among Defendants with respect to business dealings, ownership of corporate entities, employment, and financial arrangements, (*id.* ¶¶ 3–4, 8–15); (3) the operations of the overall scheme granting access to patients in exchange for referrals and payments for medically unnecessary services, (*id.* ¶¶ 47–250); and (4) the medically unnecessary services allegedly provided, including specific allegations about the nature of each type of treatment or test provided, (*id.*).

Because Plaintiffs allege in the Complaint extensive detail as to the alleged fraudulent practices, the Court finds that Plaintiffs have satisfied their evidentiary burden.  *See State Farm*, 120 F.4th at 84 (concluding that plaintiff insurance companies "demonstrated sufficiently serious questions going to the merits" where plaintiffs "describe[d] a web of interconnected relationships among the various [d]efendants, illegal financial arrangements tying many of the [d]efendants together, medically unnecessary treatment and services provided to patients, and unauthorized ownership or operation of medical facilities by some [d]efendants"); *Gerling*, 718 F. Supp. 3d at 276–77 (finding plaintiffs described the scheme in sufficient detail by alleging that "medically unnecessary procedures were performed pursuant to an illegal patient-brokering scheme . . . where bills for reimbursement were submitted with misrepresentations in order to maximize . . . financial gain" and the complaint "recite[d] dozens of specific examples"); *Zaitsev*, 2021 WL 3173171, at *2 (holding that the allegations supporting the preliminary injunction "are not conclusory since they are supported by detailed examples throughout the complaint," including "specific patients and treatment dates"); *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at

27

*4–5 (rejecting the defendants' argument that "the evidence proffered by [the plaintiff] [wa]s insufficient to satisfy the elements for injunctive relief" because the plaintiffs alleged that the defendants "perpetrated a fraudulent medical billing scheme where [the] defendants submitted medically unnecessary claims for reimbursement to [the plaintiffs] in furtherance of [the] defendants' financial gain" and "provide[d] specific factual examples of [the] defendants' allegedly fraudulent scheme and exploitation of the New York [no-fault] insurance system"); *Moshe*, 2020 WL 3503176, at *2 ("While many courts have granted injunctions after considering a more developed record, a complaint alone can be sufficient to grant an injunction.  This is particularly true where, as here, the complaint comprehensively details regulatory violations, unnecessary medical services, and unlawful referrals."  (first citing *Strut*, 2020 WL 1820500, at *2; and then citing *Liberty Mut. Ins. Co. v. Excel Imaging*, 879 F. Supp. 2d 243, 254–64 (E.D.N.Y. 2012))); *Strut*, 2020 WL 1820500, at *2 (rejecting implausibility argument where the complaint provided "numerous examples to support each of [the plaintiff's] fraud theories, citing specific patients, accident dates, and treatment dates"); *Cean*, 2019 WL 6253804, at *5 (finding a serious question going to the merits where plaintiffs "alleged, in significant detail, facts relating to [the] [d]efendants' fraudulent activity in [their] [c]omplaint, describing fraudulent medical treatment, deceitful billing protocols, and an illegal kickback and referral scheme"); *Parisien*, 352 F. Supp. 3d at 234 (holding that, in light of the plaintiffs' allegations and exhibits, "it cannot be said that [the plaintiffs'] request for injunctive relief 'rest[ed] on mere hypotheticals'" (quoting *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992))).

Although the question of whether under New York law improper payments for patient referrals alone is sufficient to justify an insurer denying payment for no-fault benefits is pending, *see Gov. Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 421 (2d Cir. 2024), *certified question*

*accepted*, 42 N.Y.3d 1045 (2024); 42 N.Y.3d at 1045, in addition to alleging a scheme of hidden "lease" payments among Defendants for referrals, Plaintiffs also allege that the scheme depends on systemic illegitimate "return referrals," (Compl. ¶ 67), Innovation Anesthesia's unlawful provision of professional services in New Jersey, (*id.* ¶¶ 47–53), and submitting fraudulent billing, (*id.* ¶¶ 34–53, 252).

Accordingly, Plaintiffs have shown a serious question as to whether Defendants are eligible to receive reimbursement for no-fault benefits.

### ii.  Irreparable harm

Plaintiffs argue that "GEICO will suffer irreparable harm absent a stay and injunction . . . . " (Pls.' Mem. 7.)  In support, Plaintiffs argue that they are "faced with 760 individual no-fault arbitration proceedings and more than 200 individual lawsuits" such that "potentially dozens of inconsistent awards . . . will frustrate GEICO's attempt to obtain declaratory relief in this action."  (*Id.*)  Plaintiffs also argue that "in analogous no-fault insurance fraud cases, the risk of inconsistencies between arbitrations and collection lawsuits and a court's ruling establishes irreparable harm."  (*Id.*)

Defendants argue that Plaintiffs have failed to prove irreparable harm because "'mere injuries . . . in terms of money, time and energy necessarily expended' absent a stay of ongoing state court and arbitration proceedings 'are not enough' to establish irreparable harm" where Plaintiffs could be "fully compensated through money damages."  (Defs.' Opp'n 4–6 (quoting *Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017)).)

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *State Farm*, 120 F.4th at 80 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)); *Gov't Emps. Ins. Co. v. Barakat*, 709 F. Supp.

3d 93, 100 (E.D.N.Y. 2024) ("The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction . . . ." (quoting *Elzanaty*, 929 F. Supp. 2d at 221)). To establish irreparable harm, "the moving party 'must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *State Farm*, 120 F.4th at 80 (alteration in original) (quoting *Faiveley Transp.*, 559 F.3d at 118). "Thus, irreparable harm exists 'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *Id.* at 80 (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)). Absent "extraordinary circumstances," injunctions are also unavailable "[w]here there is an adequate remedy at law, such as an award of money damages." *Id.* (quoting *Moore*, 409 F.3d at 510). "[T]he moving party must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.'" *Id.* (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). "Courts have readily held that irreparable harm occurs where . . . an insurer is required to waste time defending numerous no-fault actions when those same proceedings could be resolved globally in a single, pending declaratory judgment action." *Parisien*, 352 F. Supp. 3d at 233 (first citing *Gov't Emps. Ins. Co. v. Strutsovskiy*, No. 12-CV-330, 2017 WL 4837584, at *6 (W.D.N.Y. Oct. 26, 2017); and then citing *Elzanaty*, 929 F. Supp. 2d at 222); *see, e.g.*, *Gerling*, 718 F. Supp. 3d at 274 (finding the plaintiffs demonstrated irreparable harm because "if [the defendants were] permitted to continue pursuing collection arbitrations during the pendency of th[e] lawsuit," the "arbitration actions 'might eventually be, at best, inconsistent with th[e] [c]ourt's ruling, and at worst, essentially

ineffective'" (quoting *Elzanaty*, 929 F. Supp. 2d at 222)); *see also Zaitsev*, 2021 WL 3173171, at

*2 ("Courts in this Circuit have found . . . that '[i]rreparable harm occur[ed] where "an insurer is

required to waste time defending numerous no-fault actions when those same proceedings could

be resolved globally in a single, pending declaratory judgment action."'" (second and third

alterations in original) (quoting *Moshe*, 2020 WL 3503176, at *1) (collecting cases)).

       Plaintiffs have sufficiently demonstrated that they will suffer irreparable harm absent a

stay and injunction.  Plaintiffs' assertions that, absent the requested injunctive relief, the "760

individual no-fault arbitration proceedings and more than 200 individual lawsuits pending" will

risk "inconsistent awards before multiple arbitrators" and "frustrate [Plaintiffs'] attempt to obtain

declaratory relief in this action," are sufficient to demonstrate irreparable harm.  (Pls.' Mem. 7.)

*See Gerling*, 718 F. Supp. 3d at 276, 276 n.3, 279 (finding that the fact there were just four

pending arbitrations was not "dispositive," but nonetheless was sufficient to demonstrate

irreparable harm absent a stay due to the risk of inconsistent judgments, the potential

unavailability of money damages, and the risk that "fragmenting" the dispute into the

approximately fifty or more pending lawsuits "would nullify [plaintiffs'] efforts to prove fraud at

a systemic level" and "deprive [plaintiffs] of an avenue toward complete relief in *any* court");

*Zaitsev*, 2021 WL 3173171, at *2 n.3 (noting that although *Harvey* concluded that "wasted time

and resources do not constitute irreparable harm," "*Harvey* does not preclude granting an

injunction to avoid inconsistent judgments" (quoting *Moshe*, 2020 WL 3503176, at *2)); *Beynin*,

2021 WL 1146051, at *4–6 (concluding that "the likely inconsistencies amongst the prospective

arbitral rulings themselves, and between the prospective arbitral rulings and th[e] [c]ourt's

ultimate disposition of the declaratory judgment and fraud-based claims" constituted irreparable

harm (citation omitted) (collecting cases)); *Advanced Comprehensive Lab'y*, 2020 WL 7042648,

at *5 (rejecting the defendants' argument based on *Harvey* that the plaintiff will not suffer

irreparable harm and noting that if the defendants were "permitted to prosecute the ongoing

collection proceedings, [the plaintiff] faces imminent and non-speculative risks of inconsistent

judgments and unnecessary expenditure of time and resources on arbitration," which shows

irreparable harm); *Cean*, 2019 WL 6253804, at *5 (concluding "that wasting time and resources

in arbitrations with awards that might eventually be, at best, inconsistent with judicial rulings

and, at worst, essentially ineffective, constitutes irreparable harm"); *Mayzenberg*, 2018 WL

6031156, at *5 (noting that unlike the injuries noted in *Harvey*, "it is the inconsistency to which

hundreds of arbitrations will inevitably give rise, the frustration of the declaratory judgment

relief for which [the plaintiff] is likely to succeed on the merits, and the resources spent vacating

hundreds of arbitration awards that satisfies the irreparable harm prong"); *Strutsovskiy*, 2017 WL

4837584, at *7 (staying no-fault collection arbitrations pending the resolution of the plaintiff's

declaratory judgment action and rejecting the notion that *Harvey* barred a preliminary

injunction); *Elzanaty*, 929 F. Supp. 2d at 222 (finding that "allowing a large number of

proceedings to be heard by a mix of arbitrators, each of whom will likely come to their own

independent and potentially contradictory conclusions, will result in harm to [the plaintiff] from

which it cannot recover"). In addition, in the month following Plaintiffs' filing of their

complaint Innovation Anesthesia, JPM PT, and Liberty Park Chiro initiated over 500 suits and

arbitrations seeking to collect on the same bills at issue in the Complaint, (Pls.' Mem. 5), all of

which supports Plaintiffs' demonstration of irreparable harm from the real risk of future

proceedings. *See Gerling*, 718 F. Supp. 3d at 277 (explaining that plaintiffs would be irreparably

harmed if "future collection proceedings are not enjoined"); *Advanced Comprehensive Lab'y*,

2020 WL 7042648, at *4 ("Moreover, under these circumstances, the court agrees that [the

plaintiff] will suffer irreparable injury that 'is neither remote nor speculative' without injunctive relief because [the defendant] continues to commence arbitrations before the AAA." (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007))).

The Court is not persuaded by Defendants' arguments as to why Plaintiffs have allegedly not shown irreparable harm. First, Defendants argue that the "risk of inconsistent outcomes between [the federal action] and the no-fault arbitrations that will frustrate [Plaintiffs'] attempt for declaratory relief" is insufficient to demonstrate irreparable harm, (Defs.' Mem. 5), but Defendants' reliance on *Harvey* is misplaced. The Second Circuit has distinguished *Harvey* — where the defendant was an "illegally owned and improperly licensed" business, *Allstate Ins. Co. v. Harvey Fam. Chiropractic, Physical Therapy & Acupuncture, PLLC*, No. 15-CV-7149, 2018 WL 8544440, at *1 (E.D.N.Y. Sept. 21, 2018), and was not operating a complicated scheme that would be difficult to establish in arbitrations and state-court proceedings — from cases where defendants engage in a "massive and highly complex scheme" which can be "obscured in . . . piecemeal proceedings" and where the "potential preclusive effects of the arbitrations and state-court proceedings" are a significant harm.[8] *State Farm*, 120 F.4th at 81–82. As other courts in this Circuit have noted, *Harvey* "does not address the risk of inconsistent judgments." *Strut*, 2020 WL 1820500, at *3 (citing *Harvey*, 677 F. App'x at 718); *see also Moshe*, 2020 WL 3503176, at *2 ("*Harvey* does not preclude granting an injunction to avoid inconsistent

---

[8] In *Allstate Ins. Co. v. Harvey Family Chiropractic*, the Second Circuit summarily affirmed the district court's denial of a preliminary injunction of no-fault proceedings and noted (1) that there was "no evidence in the record that" the plaintiffs could not "be fully compensated through money damages for the alleged harm suffered from the defendants' fraudulent claims" and (2) that "[e]ven if the defendants obtain[ed] other [no-fault] reimbursements in state court and arbitrations while th[e] case [was] pending, the plaintiffs [were] free to recover those payments [if] they prevail[ed] on their RICO claim." 677 F. App'x 716, 718 (2d Cir. 2017).

judgments." (citing *Wellmart*, 435 F. Supp. 3d at 451)); *Wellmart*, 435 F. Supp. 3d at 451 ("[T]he Second Circuit [in *Harvey*] said nothing of the risk of inconsistent judgments.").

Second, Defendants argue that Plaintiffs can resolve their disputes in the "no-fault arbitration system," because "[t]he no-fault statute was passed by the legislature so that medical providers would have an expedited forum to obtain reimbursement from insurers for automobile injury claims without having to spend time and resources in protracted litigation." (Defs.' Opp'n 7–8.) However, the arbitration system does not provide sufficient guarantees of procedural safeguards to address concerns regarding the complexity of the scheme at issue before the Court. *See Mun*, 751 F.3d at 99 ("New York's arbitration process for no-fault coverage is an expedited, simplified affair meant to work as quickly and efficiently as possible. Discovery is limited or non-existent. Complex fraud and RICO claims . . . cannot be shoehorned into this system." (citation omitted)); *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *2 (same); *Mayzenberg*, 2018 WL 6031156, at *6 (same); *see Beynin*, 2021 WL 1146051, at *6 ("In brief, the [arbitration] process is 'meant to work as quickly and efficiently as possible,'" such that "the claims brought in this action cannot be meaningfully pursued in no-fault insurance proceedings." (quoting *Mun*, 751 F.3d at 99)); *Parisien*, 352 F. Supp. 3d at 229 ("Because it is only through this tapestry of facts that the alleged fraud comes into focus, [the plaintiffs] may not as a practical matter have a fair opportunity to present [their] claims unless [they are] permitted to direct the trier of fact to all of the claims at issue."); *cf. State Farm*, 120 F.4th at 92 (explaining that the Federal Arbitration Act did not bar the Court from enjoining arbitrations proceeding under New York's process for no-fault coverage because "the thousands of allegedly baseless arbitrations . . . [would] help to further the massive and complex RICO scheme alleged").

Accordingly, the Court finds that Plaintiffs have shown irreparable harm.

### iii.  Balance of hardships

Plaintiffs argue that "[t]he [b]alance of [h]ardship [w]eighs in [f]avor of a [s]tay." (Pls.' Mem. 17.)  In support, Plaintiffs argue that, absent a stay, they "will face a multitude of individual arbitrations," and risk "fragmented results" in no small part because "[Plaintiffs'] evidence of fraud consists of information from multiple claims . . . [and their] ability to take discovery and present evidence of this level of complexity is practically impossible in the context of a single state court collection lawsuit.  (*Id.* at 18, 22 (internal quotation marks and citations omitted).)  Plaintiffs also argue that "Defendants will suffer no hardship if their right to collect on their pending billing is adjudicated in a single, efficient, declaratory judgment action, rather than on a piecemeal basis in multiple collection proceedings with the prospect of significantly varying outcomes." (*Id.* at 17–18 (citations omitted).)

Defendants argue that "[t]he [b]alance of [h]ardships [t]ips [d]ecidedly" in their favor, because "a preliminary injunction would force Defendants to work for free, while [Plaintiffs] den[y] claims and avoid[ ] the statutory arbitration process . . . . [which] causes an extreme imbalance [because] Defendants [do] not have the same money and resources as [Plaintiffs]." (Defs.' Opp'n 12.)

Under the third prong of the preliminary injunction analysis, a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *State Farm*, 120 F. 4th at 84 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020)).  If there are "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation," courts inquire into whether there is "a balance of the hardships tipping decidedly in favor of the moving party."  *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 42–43 (2d Cir. 2020) (quoting *Oneida Nation of N.Y. v. Cuomo*,

645 F.3d 154, 164 (2d Cir. 2011)); *State Farm*, 120 F.4th at 79–80 ("Because under the 'serious questions' standard a party would have to demonstrate both serious questions on the merits and a balance of hardships decidedly favoring the moving party, the 'overall burden is no lighter than the one [the party] bears under the "likelihood of success" standard.'" (quoting *Citigroup*, 598 F.3d at 35)); *see also TushBaby, Inc. v. Jinjang Kangbersi Trade Co. Ltd.*, No. 24-CV-6150, 2024 WL 4627452, at *2 (S.D.N.Y. Oct. 30, 2024) (same); *Parisien*, 352 F. Supp. 3d at 234 ("Because the [c]ourt finds that there are 'serious questions going to the merits' in lieu of a 'likelihood of success on the merits,' it must further inquire as to whether . . . there is a 'balance of hardships tipping decidedly' in [the plaintiff's] favor." (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979))).

Absent a preliminary injunction, Plaintiffs face 750 pending arbitrations and 200 individual pending lawsuits, and likely hundreds or thousands of additional arbitrations and state-court proceedings to resolve the over $3 million of Defendants' total submitted bills currently unpaid and not yet subject to arbitration or court proceedings. (Pls.' Mem. 7, 5.) Defendants do not appear to face a similar level of uncertainty in their competing concern of policy exhaustion, as they speak generally of exhaustion risk without identifying any specific set of policies nearing exhaustion. (Defs.' Opp'n 13 ("Each of the underlying insureds who received treatment from Defendants have policies that contain a no-fault insurance limit . . . Given that many policy limits are quite low in comparison to the treatment required, the policies can be exhausted very quickly.").) *See State Farm*, 120 F.4th at 85 (affirming the Court's conclusion that plaintiff insurance companies' allegations of a fraudulent conspiracy "raise[d] serious and substantial allegations that demonstrate actual and imminent irreparable harm absent and injunction, whereas [d]efendants' alleged hardships of economic impact can be remedied by

monetary damages should they later prevail"); *Moshe*, 2020 WL 3503176, at *3 (finding that the balance of hardships weighed in favor of the insurer where the insurer "will face thousands of different proceedings" and defendants' policy exhaustion argument "[was] speculative at best considering defendants [did] not identify any policies nearing exhaustion").

Moreover, Defendants are entitled to interest if they prevail. *See Demesmin*, 2024 WL 4573698, at *4 (noting that "[b]ecause the defendants will presumably be entitled to collect interest on their pending claims if they prevail, the delay [did] not outweigh the risk of inconsistent outcomes faced by [the plaintiff]" (citation omitted)); *Elzanaty*, 929 F. Supp. 2d at 222 (noting that the defendants will "benefit from the stay if [they] ultimately prevail[] in th[e] matter, because [they] will be entitled to the collection of interest"); *Zaitsev*, 2021 WL 3173171, at *3 (noting that the "defendants will not be disadvantaged if the stay is granted since they will be entitled to statutory interest on their unpaid claims should they ultimately prevail" (first citing *Elzanaty*, 929 F. Supp. 2d at 222; and then citing *Mayzenberg*, 2018 WL 6031156, at *7)); *Mayzenberg*, 2018 WL 6031156, at *7 ("[I]f [the defendants] prevail in this action, they are entitled to statutory interest on their unpaid claims."); *Parisien*, 352 F. Supp. 3d at 234–35 ("If the preliminary injunction is granted and [the plaintiffs] fail[] to prove [their] claims, then, at worst, [the defendants'] recovery of the no-fault benefits to which they are entitled will be delayed; all [the defendants] can hope for in pursuing their parallel state lawsuits and arbitrations is to accelerate their receipt of benefits to which they are already entitled.").

A stay of pending and future arbitrations and lawsuits addressing similar claims will save the parties time and resources and promote judicial efficiency. *See Gerling*, 718 F. Supp. 3d at 278 (concluding that "granting the stay and injunction will actually save all parties time and resources[,] because all claims can be efficiently and effectively dealt with in a single declaratory

judgment action rather than in piecemeal fashion" (internal quotation marks and citation omitted)); *Beynin*, 2021 WL 1146051, at *8 (holding that "consolidation promotes efficiency in cases like this . . . notwithstanding [the defendants'] claim that they will suffer financially," especially where "they have not specified the extent of that hardship — *e.g.*, how much of their income the outstanding and pending claims constitute" (first citing *Cean*, 2019 WL 6253804, at *5; and then citing *Advanced Comprehensive Lab'y*, 2020 WL 7042648, at *8)); *Zilberman*, 2021 WL 1146086, at *2 ("[G]ranting the stay and injunction will actually save all parties time and resources.  Rather than adjudicating hundreds of individual claims in a piecemeal fashion, all claims can be efficiently and effectively dealt with in a single declaratory judgment action." (first quoting *Cean*, 2019 WL 6253804, at *5; and then citing *Elzanaty*, 929 F. Supp. 2d at 222)); *Strut*, 2019 WL 6338023, at *8 (stating that "[j]udicial economy tips the balance of those equities decidedly in [the plaintiffs'] favor" where the plaintiffs would otherwise "have to make payments on claims with serious questions about consistency" (citing *Strutsovskiy*, 2017 WL 4837584, at *7)); *Mayzenberg*, 2018 WL 6031156, at *7 ("[I]t is obviously more efficient and beneficial for [the defendants] if all of their claims are resolved in one action, rather than in hundreds of different proceedings.").

Accordingly, the Court finds that the balance of hardships tips decidedly in Plaintiffs' favor.

### iv.  Public interest

Plaintiffs argue that "[f]ar from creating friction between the state and federal courts, an injunction in this case will serve the public policy of New York in combatting insurance fraud in the no-fault sector."  (Pls.' Mem. 23 (quoting *Gov't Emps. Ins. Co. v. Wallegood, Inc.*, No. 21-CV-1986, slip op. at 18 (E.D.N.Y. July 16, 2021) (order granting preliminary injunction)))

(internal quotation marks omitted).)  Plaintiffs also argue that in a dispute between private parties, "it is not required to demonstrate that the proposed injunction will not harm the public interest . . . [but] it is well within the public interest to stay No-Fault collection proceedings during the pendency of a plaintiff-insurers declaratory judgment action involving claims of fraud."  (*Id.* at 19 n.20 (citing *In re Soundview Elite Ltd.*, 543 B.R. 78, 118 n.210 (Bankr. S.D.N.Y. 2016) ("Normally the public interest is not a factor on preliminary injunction applications involving private disputes.").)  Defendants make no argument as to the public interest factor.

In analyzing the public interest prong, a court must consider "the public consequences in employing the extraordinary remedy of injunction," *Yang*, 960 F.3d at 135–36 (quoting *Winter*, 555 U.S. at 24), and ensure that the proposed injunction "does not cause harm to the public interest," *SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) (per curiam); *see also State Farm*, 120 F.4th at 85 (explaining that courts "consider whether the preliminary injunction is in the public interest, which concerns the 'public consequences in employing the extraordinary remedy of injunction'" (quoting *Yang*, 960 F.3d at 135–36)).

There is no indication that granting an injunction would harm the public interest.  *See State Farm*, 120 F.4th at 85 ("Preventing fraud, especially the kind of elaborate and complex RICO scheme alleged here, is plainly in the public interest."  (quoting *Mun*, 751 F.3d at 100)); *Beynin*, 2021 WL 1146051, at *10 (noting that "preventing fraud of the sort alleged [under New York's no-fault laws] is in the public interest" (citing *Wellmart*, 435 F. Supp. 3d at 456)); *Strut*, 2020 WL 1820500, at *3 n.8 (finding that the public interest factor in a preliminary injunction and stay as to no-fault proceedings was neutral); *Mayzenberg*, 2018 WL 6031156, at *10 (noting that "[p]reventing fraud on our health care system is also in the public's interest" where

"allegations of fraud on our health care system generally, and even the specific civil RICO scheme alleged here, have become too common").

Because there are serious questions going to the merits of the case, Plaintiffs would suffer irreparable harm absent a stay, the balance of hardships weighs in Plaintiffs' favor, and there is no indication that the public interest would be harmed as a result of a stay, the Court grants Plaintiffs' motion to stay all pending arbitrations and state court proceedings and to enjoin all future arbitrations and state court proceedings.

### d.   Security for the injunction

Plaintiffs argue that no bond should be required because they have provided "detailed and plausible fraud claims," they have "already paid the Defendants over $6,300,000 on their allegedly-fraudulent claims," they contend there is no "plausible claim that GEICO ultimately might be unable to compensate any wrongfully-enjoined Defendants," and that "Defendants' arguments regarding insurance policy exhaustion are . . . speculative and without factual support."  (Pls.' Reply 10.)  Plaintiffs also argue that most courts do not require it to post bond. (*Id.* (citations omitted).)

Defendants argue that Plaintiffs should be required to post bond because "if any injunction is issued, a bond is needed to cover Defendants' outstanding claims plus interest, an amount which continues to grow."  (Defs.' Opp'n 14–15 (citing *Strut*, 2020 WL 1820500, at *3).)

Rule 65(c) of the Federal Rules of Civil Procedure states that "the court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c); *see also State Farm*, 120 F.4th at 86 (quoting same).  "The phrase in such sum as the court deems proper[] indicates that the [d]istrict [c]ourt is

40

vested with wide discretion in the matter of security[,] and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm . . . ."  *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation marks omitted) (first quoting *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961); and then citing *Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976)); *see also State Farm*, 120 F.4th at 86 ("Courts have the discretion, however, to require no security at all depending on the specific circumstances." (quoting *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004))); *Gerling*, 718 F. Supp. 3d at 280 ("Courts in this district have repeatedly reasoned that the enforcement of no-fault insurance statutes is in the public interest, as is the prevention of fraud on the healthcare system, and, accordingly, have waived the security requirement upon identifying the 'systemic nature of the fraud alleged in the complaint and the lack of prejudice to defendants resulting from a preliminary injunction.'"  (quoting *Wellmart*, 435 F. Supp. 3d at 456)); *Dr.'s Assocs. LLC v. Hai*, No. 19-CV-1968, 2019 WL 2385597, at *5 (E.D.N.Y. June 6, 2019) ("[A] district court in its discretion may deny a bond altogether if there is 'no proof of likelihood of harm' to the non-movant." (alteration in original) (quoting *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013))).  "Rule 65(c)'s security requirement is designed to 'assure[] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff.'"  *State Farm*, 120 F.4th at 86 (alteration in original) (quoting *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011)); *U.S. D.I.D. Corp. v. Windstream Commc ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014) (quoting same).

Because Plaintiffs have established a likelihood of harm, a stay is unlikely to prejudice Defendants, and Defendants may readily collect damages from Plaintiffs, the Court declines to

require Plaintiffs to post a bond.  *See Demesmin*, 2024 WL 4573698, at *5 (waiving security

under Rule 65(c) because "there is no question that [plaintiffs] will be able to pay if the

defendants prevail"); *Zaitsev*, 2021 WL 3173171, at *3 (waiving Rule 65(c) requirement where

"the requested injunction will not cause [the defendants] any prejudice at all" and "[the insurer]

undoubtedly has the ability to pay if defendants prevail" (first quoting *Moshe*, 2020 WL

3503176, at *4; then citing *Wellmart*, 435 F. Supp. 3d at 456; and then citing *Mayzenberg*, 2018

WL 6031156, at *10)); *Beynin*, 2021 WL 1146051, at *10 (waiving the security requirement of

Rule 65(c) where the parties "may well benefit from consolidation and interest" (first citing

*Cean*, 2019 WL 6253804, at *5; and then citing *Elzanaty*, 929 F. Supp. 2d at 222)); *Advanced*

*Comprehensive Lab'y*, 2020 WL 7042648, at *8 (waiving the security requirement of Rule 65(c)

"in light of the systemic nature of the fraud alleged in the complaint and the lack of prejudice to

[the] defendants resulting from a preliminary injunction" (citing *Mayzenberg*, 2018 WL

6031156, at *10))); *Moshe*, 2020 WL 3503176, at *4 ("[The insurer] undoubtedly has the ability

to pay if [the] defendants prevail.  As such, [the] defendants will suffer no harm from the

injunction and the bond requirement is waived."  (citing *Wellmart*, 435 F. Supp. 3d at 456));

*Wellmart*, 435 F. Supp. 3d at 456 (waiving security requirement "in light of the systemic nature

of the fraud alleged in the complaint and the lack of prejudice to defendants resulting from a

preliminary injunction"); *Mayzenberg*, 2018 WL 6031156, at *10 (waiving the security

requirement of Rule 65(c) where the court "concluded that a preliminary injunction will not

result in any prejudice to [the defendants] and would actually benefit them if all of their claims

are decided in one proceeding").

**III.    Conclusion**

For the foregoing reasons, the Court grants Plaintiffs' motion.  The Court stays all pending no-fault insurance collection arbitrations and state court collections litigation commenced against GEICO by or on behalf of Innovation Anesthesia, Chen, Liberty Park Chiro, Mangguray, Ciccone, and JPM PT.  The Court also enjoins all Defendants from commencing any new no-fault insurance collection arbitrations or new no-fault insurance collections litigation against GEICO, pending the resolution of GEICO's claims in this action.  The Court declines to require Plaintiffs to post a bond.

Dated:  March 25, 2025
          Brooklyn, New York

SO ORDERED:


_____/s MKB_____
MARGO K. BRODIE
United States District Judge